# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:            : CASE NO. 1:13-bk-01380

    KEYSTONE BIOFUELS, INC.    :

                             :       CHAPTER 11

    Debtor                 :

## DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTOR-IN-POSSESSION TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; AND (B) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The Motion of Keystone Biofuels, Inc. ("Debtor"), by and through its attorneys, Cunningham and Chernicoff, P.C. for Entry of Interim and Final Orders (A) Authorizing the Debtor-In-Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364; and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 is as follows:

1.      On March 18, 2013, the Debtor filed a Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Code ("Code"). As a result thereof, the Debtor has been appointed debtor-in-possession and manages its assets and operates its business.

2.      The Debtor is a business corporation which manufactures petroleum products and related products from various agricultural items (the "Business").

3.      At the beginning of this case, the Debtor was not operating. In the past, the Debtor periodically would stop operations based upon demand for its products and its cash needs.

4.      The Debtor has been securing orders for its products and it now desires to begin operations.

5.     This Motion is filed under Sections 105, 361, 363 and 364 of the Code and Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure. The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334, venue pursuant to 28 U.S.C. §§ 1408 and 1409 and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## PRE-PETITION LIENS

6.     The Debtor has three (3) credit facilities granted to it by First National Bank of Pennsylvania ("FNB"). The total amount owed to FNB on all three (3) credit facilities is believed to be in excess of $4,300,000.00.

7.     In order to secure the obligations owed by the Debtor to FNB, the Debtor granted FNB a security interest in certain of the Debtor's pre-Petition assets including equipment, machinery, accounts receivable and inventory. FNB does not have a lien on any motor vehicles owned by the Debtor.

8.     The pre-Petition assets of the Debtor consist generally of one account receivable of approximately $431,000.00, which may not be collectible, minimal cash in its bank accounts, inventory of raw products consisting of miscellaneous product with a value of approximately $58,000.00, machinery and equipment having a value of approximately $6,550,000.00 and office equipment and supplies having a value of approximately $44,000.00.

9.     The cash collateral owned pre-Petition by the Debtor consists of the account receivable, inventory and the minimal cash set forth above in paragraph 8 (the "Cash

Collateral"). FNB's security interest and lien is believed to be the only lien on the Debtor's Cash Collateral. The FNB lien is currently only on pre-Petition collateral.

## THE NEED FOR FINANCING AND USE OF CASH

10.     Pre-Petition, the Debtor employed eleven (11) employees. As part of the Debtor's intention to begin operations, the Debtor has contacted those employees who are necessary for current operations and believes that it will be able to operate with eight (8) to nine (9) employees.

11.     Because of the Debtor's lack of cash, inventory and receivables, the Debtor has sought post-Petition financing.

12.     The Debtor believes that it can operate profitably and reorganize as budgeted by the Debtor. Attached hereto as Exhibit "A" and made a part hereof is the Debtor's budget (the "Budget") for the period of May, 2013 through November, 2013.

13.     Post-Petition, the Debtor has secured financing which it would utilize for operations. The Budget sets forth that the Debtor will need $350,000.00 to begin operations.

14.     As set forth on Exhibit "B," which is attached hereto and made a part hereof, the Debtor believes that its cash needs for the next fifteen (15) days is $241,034.55 (the "Interim Funding").

## PROPOSED FINANCING

15.     The Debtor has an affiliated company known as KBI Industries, Inc. ("KBI"). The Debtor is 100% owned by Benjamin Wootton. Seventy percent (70%) of the stock in KBI Industries, Inc. is owned by Mr. Wootton, twenty percent (20%) stock of KBI is owned

3

by DBN Investments, LLC ("DBN"), and the remaining ten percent (10%) of the stock in KBI is owned by KAM Investments, LLC ("KAM").

16.    KBI leases certain equipment which is necessary for the operation of the Debtor.  The leases are with two (2) companies known as Mazuma ("Mazuma") and Tetra Corporate Services ("Tetra").

17.    The Debtor is named as co-lessee with KBI concerning the Mazuma and Tetra Leases.

18.    DBN and KAM collectively are pre-Petition, unsecured creditors of the Debtor, in an amount in excess of $2,000,000.00.

19.    Attached hereto as Exhibit "C" and made a part thereof is a proposal (the "Loan Agreement") from David B. Nagle, the principal of DBN and on behalf of DBN and its affiliates, and Keith A. McMahan, the principal of KAM, and on behalf of KAM and its affiliates, to provide a $350,000.00 post-Petition loan.  Some of the significant terms of the Loan Agreement are as follows:

a.    The Loan will be in the amount of $350,000.00.

b.    The interest rate on the Loan is 4% per annum on the unpaid principal balance.

c.    Interest only shall be payable by the Debtor for sixty (60) days. Thereafter, principal payments of $5,000.00, plus accrued interest is payable, until the Loan is repaid in full.

d.    The Loan is intended to be without collateral.  The Loan will be repaid from the operations of the Debtor and receivables and cash created post-Petition.

4

e.     The repayment of the Loan will be subordinate to the necessary payments required to FNB under the Debtor's Budget.

f.     The Debtor intends to begin payments to FNB, Mazuma and Tetra from the Interim Funding.

## AMERIGREEN TRANSACTION

20.     Keith McMahan, the principal of KAM owns another company known as Tri-Gas and Oil Company, Inc., and its affiliates, ("Tri-Gas"). Tri-Gas, or its affiliates, has agreed to purchase up to 100,000 gallons of B100 biodiesel finished product from the Debtor. Attached hereto as Exhibit "D" and made a part hereof is a proposal by Tri-Gas to purchase up to 100,000 gallons of B100 biodiesel from the Debtor.

21.     The purchase by Tri-Gas of the 100,000 gallons of biodiesel serves two (2) purposes. As set forth on Exhibit "D," Tri-Gas will resell the finished product to a company known as AmeriGreen. AmeriGreen is a regular customer of the Debtor.

22.     Pre-Petition, the Debtor had arranged for the sale of finished biodiesel product to AmeriGreen in the total amount of 55,000 gallons of B100 biodiesel. The Debtor had been unable to produce such product and the order is still pending. It is believed that AmeriGreen will purchase an additional 45,000 gallons of B100 biodiesel resulting in the total of 100,000 gallons.

23.     The Debtor believes that if it is able to fulfill the existing order with AmeriGreen, and that AmeriGreen will purchase additional product.

Case 1:13-bk-01380-MDF    Doc 88-1    Filed 05/09/13    Entered 05/09/13 16:31:54    Desc
Exhibit A    Page 6 of 19

24.     In addition, the Debtor has been negotiating with additional potential customers of its product. One of the potential customers is the Shell Oil Company, a major petroleum company ("Shell").

25.     In order for Shell to agree to purchase finished product from the Debtor, the Debtor must demonstrate that its facility is capable of producing the product. Further, Shell needs to test certain aspects of the product. The Debtor believes the production for the sale to Tri-Gas will fulfill this Shell requirement.

26.     Therefore, the Debtor believes that it is in its best interest to fulfill the existing order from AmeriGreen for 55,000 gallons as well as fill an order for AmeriGreen for the additional 45,0000 gallons. The sale by Tri-Gas of the 100,000 gallons to AmeriGreen will produce a small profit for the Debtor. Further, the sale to AmeriGreen will allow the Debtor to show potential purchasers of its product, including Shell, and other companies, that it is capable of producing biodiesel products. Thus, the AmeriGreen transaction may result in additional orders for the Debtor's products.

27.     Not only has Tri-Gas agreed to purchase the 100,000 gallons of finished B100 biodiesel, but Tri-Gas, or its affiliates, will also pre-purchase all feed stock product and chemicals, as needed to fulfill the 100,000 gallon order. The terms of the purchase by Tri-Gas of the 100,000 gallons from the Debtor, as well as the purchase of the feed stock product and chemicals is as follows:

> a.     Tri-Gas, or its affiliates, will initially purchase the necessary feed stock product and chemicals to allow the Debtor to produce 50,000 gallons of B100 product. Tri-Gas may then purchase the remaining chemicals needed to

produce 100,000 gallons of the B100 product. The approximate cost for the feed stock product and chemicals is $427,000.00.

b.     Tri-Gas will lease on a short term up to two (2) storage tanks at the Debtor's facility to store the feed stock product. Tri-Gas will also store the chemicals at the Debtor's facility.

c.     Tri-Gas will purchase the 100,000 gallons of finished product from the Debtor in two (2) groups of approximately 50,000 gallons each by providing the feed stock product and chemicals. 55,000 gallons will be sold to AmeriGreen at the rate of $3.95 per gallon. 45,000 gallons will be sold to AmeriGreen at the rate of $4.75 per gallon, for a total price to AmeriGreen of $431,000.00.

d.     Tri-Gas will sell the finished product to AmeriGreen for the sum of $431,000.00 resulting in a small profit to Tri-Gas of $4,000.00 over the feed stock product and chemical costs of $427,000.00.

e.     In exchange for the storage and lease of the feed stock product and chemicals at the Debtor's facility and for the use of the Debtor's facility to produce the finished B100 biodiesel, the Debtor will have the right to recover the residual chemicals from the 100,000 gallons. The Debtor will realize an approximate amount from the recovery of the residual chemicals of $20,000.00 to $22,000.00. The sum to be earned by the Debtor by this arrangement is reasonable and substantial.

28.     The purchase by Tri-Gas of the 100,000 gallons of B100 biodiesel is not technically a financing transaction. However, because Tri-Gas has a relationship with the Debtor and because it is an affiliate of a shareholder of KBI, the Debtor is providing notice of the transaction and requesting approval of the transaction to the extent it is a financing transaction deemed not be in the ordinary course of business.

29.     Because Tri-Gas is paying a fee to the Debtor for the lease of the storage tanks and for the production of the B100 biodiesel, Tri-Gas will own all feed stock product and materials and chemicals as well as the finished product.

7

30.     Because of the nature of the transaction, the Debtor believes that the lien of FNB does not attach to either the feed stock product and chemicals or to the finished B100 biodiesel product.

31.     To the extent that it is determined that a new receivable of the Debtor has been created by the Debtor for the sum owed by AmeriGreen as the ultimate purchaser of the finished B100 biodiesel, because any sum which is owed by AmeriGreen is created post-Petition, the Debtor also believes that the lien of FNB does not attach to such receivable.

32.     Thus, to the extent necessary, the Debtor is requesting authority from the Court under 11 U.S.C. §364(c) for the obtaining of credit from Tri-Gas and the granting of collateral consisting of property of the estate which is not otherwise subject to a lien.

### INTERIM NEED FOR CASH

33.     As set forth above, attached hereto as Exhibit "B" is a listing of the items which the Debtor needs to pay within the next fifteen (15) days totaling $241,034.56.  In order to assure the Debtor of its continued operation, the Debtor is therefore requesting that it be awarded approval of the financing set forth above on an interim and emergency basis in an amount of up to $250,000.00.

34.     Bankruptcy Rule 4001(c)(2) provides that this Court may commence a final hearing on this Motion within fourteen (14) days after service of this Motion; however, an earlier hearing may be conducted to allow interim borrowing authority to the extent that authorization of the requested credit is necessary to avoid immediate and reputable harm to the Debtor's estate pending a final hearing.  The Debtor believes that it is necessary that it

8

immediately begin operations so as to take advantage of pending orders and so that it may secure additional orders. The market for its product is favorable and the Debtor wishes to take advantage of such. Further, there will be a one (1) or two (2) day start-up period before it can begin to produce.

35.     Further, the Debtor believes it is necessary to fulfill the transaction with Tri-Gas with AmeriGreen so as to cause AmeriGreen to further order from the Debtor. Also, because Shell wishes to review the Debtor's operations within the next week, it is necessary that the AmeriGreen transaction be approved on an immediate basis.

36.     Therefore, as set forth above, the Debtor believes that unless the Court set a hearing date sooner than fourteen (14) days from the date of service of this Motion and grant interim emergency relief pending the final hearing on the Motion, that its estate may suffer immediate and reputable harm pending a final hearing. The Debtor requests that an emergency hearing be set as early as possible on this Motion and that at such hearing interim authority be granted to the Debtor to borrow $250,000.00, and to enter into the AmeriGreen transaction, pending a final hearing on the Motion.

37.     The Debtor also requests that at the final hearing on this Motion, that it be permitted to borrow the $350,000.00 set forth above.

WHEREFORE, Debtor requests this Honorable Court enter an order:

> a.     Setting an emergency hearing on this matter at the earlier possible date, with respect to the Debtor's incurring debt and borrowing money under the financial proposal offer by DBN and KAM and providing that such lenders shall have the priority as an administrative expense under Bankruptcy Code Section 503 as to any distribution from the assets of the estate, and on the terms set forth in this Motion;

9

b.      Approving the Tri-Gas transaction as set forth above and as necessary, grant a lien in the receivable created by the Tri-Gas transaction;

c.      Confirming the ownership by Tri-Gas of the feed stock product and chemicals purchased by Tri-Gas to fulfill an order for 100,000 gallons of B100 biodiesel;

d.      Setting a final hearing on this matter as early as possible on or after fourteen (14) days from the filing date hereof;

e.      Pending the final hearing on this matter, granting interim emergency authority to the Debtor as set forth in Paragraph (a) and up to the amount of $250,000.00;

f.      After the final hearing, grant all relief, borrowing authority and administrative priority status to DBN, KAM and Tri-Gas and Oil as their interests may appear, as set forth above for the loan in the amount of $350,000.00, and as to the AmeriGreen transaction; and

g.      Granting the Debtor such other and further relief as is just and proper.

Respectfully submitted,

CUNNINGHAM & CHERNICOFF, P.C.

By:  /s/ Robert E. Chernicoff
        Robert E. Chernicoff, Esquire
        Attorney I.D. No. 23380
        2320 North Second Street
        P.O. Box 60457
        Harrisburg, PA 17106-0457
        Telephone: (717) 238-6570

Date:  May 9, 2013                  *Attorneys for Keystone Biofuels, Inc.*

# EXHIBIT

# A

**Keystone Biofuels, Inc.**
**Projected Monthly Revenues and Expenses**
**May 2013 - November 2013**

| | Re-Start Phase | Chapter 11 Phase | | | | | |
|---|---|---|---|---|---|---|---|
| | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 |
| Monthly Production Levels - Gallons | 200,000 | 750,000 | 900,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Projected Gross Profit per Gallon | $ 0.250 | $ 0.350 | $ 0.350 | $ 0.350 | $ 0.350 | $ 0.350 | $ 0.350 |
| **Total Net Revenues** | 50,000 | 262,500 | 315,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| **Costs of Operation** | | | | | | | |
| Direct Labor & Overhead | 60,000 | 90,967 | 109,160 | 121,289 | 121,289 | 113,293 | 121,289 |
| Indirect Labor & Overhead | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 |
| **Sub-total Direct/Indirect Costs** | 205,000 | 235,967 | 254,160 | 266,289 | 266,289 | 258,293 | 266,289 |
| **Contribution Margin** | (155,000) | 26,533 | 60,840 | 83,711 | 83,711 | 91,707 | 83,711 |
| FNB | 21,424 | 21,424 | 21,424 | 21,424 | 21,424 | 21,424 | 21,424 |
| Mazuma | 21,203 | 21,203 | 21,203 | 21,203 | 21,203 | 21,203 | 21,203 |
| Tetra | 16,157 | 16,157 | 16,157 | 16,157 | 16,157 | 16,157 | 16,157 |
| **Sub-Total Secured Creditors @ 33%** | 58,785 | 58,785 | 58,785 | 58,785 | 58,785 | 58,785 | 58,785 |
| **Total Expenses** | 263,785 | 294,751 | 312,944 | 325,073 | 325,073 | 317,077 | 325,073 |
| **Surplus/(Deficit) from Operations** | (213,785) | (32,251) | 2,056 | 24,927 | 24,927 | 32,923 | 24,927 |

**Keystone Biofuels, Inc.**
**Projected Cash Flows**
**May 2013 - November 2013**

| | Re-Start Phase | | | | | | |
|---|---|---|---|---|---|---|---|
| | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 |
| **Beginning Cash Balance** | - | 35,215 | 1,798 | 2,687 | 21,447 | 40,223 | 67,013 |
| **Sources of Cash** | | | | | | | |
| Operating Profit/(Loss) | (213,785) | (32,251) | 2,056 | 24,927 | 24,927 | 32,923 | 24,927 |
| Shareholder Loans | 350,000 | - | | | | | |
| Other Sources of Cash | | | | | | | |
| **Total Sources of Cash** | 136,215 | (32,251) | 2,056 | 24,927 | 24,927 | 32,923 | 24,927 |
| **Uses of Cash** | | | | | | | |
| Repayment of Unsecured Obligations | | - | - | - | - | - | - |
| Capital Expenditures | 51,000 | - | - | - | - | - | - |
| ReStart/Chapter 11 Expenses | 50,000 | - | - | - | - | - | - |
| Repayment of Shareholder Loans | - | - | - | 5,000 | 5,000 | 5,000 | 5,000 |
| Interest on Shareholder Loans @ 4% | - | 1,167 | 1,167 | 1,167 | 1,150 | 1,133 | 1,117 |
| **Total Uses of Cash** | 101,000 | 1,167 | 1,167 | 6,167 | 6,150 | 6,133 | 6,117 |
| **Net Change in Cash** | 35,215 | (33,418) | 889 | 18,760 | 18,777 | 26,789 | 18,810 |
| **Ending Cash Balance** | 35,215 | 1,798 | 2,687 | 21,447 | 40,223 | 67,013 | 85,823 |

# EXHIBIT
# B

**Total Cash Requirements**
**Keystone/KBI**

| Description | Payment |
|---|---|
| **Overhead** | |
| Rent | 30,000.00 |
| Gas - UGI | 10,000.00 |
| Phone | 500.00 |
| Electric | 10,000.00 |
| Water | 2,000.00 |
| Comcast | 250.00 |
| | |
| **Insurance** | |
| Wcomp | 2,200.00 |
| P&C | 8,500.00 |
| D&O | 2,000.00 |
| | |
| **Employee Ins** | |
| Dental | 2,200.00 |
| Health | 24,000.00 |
| | |
| **Production/Operations** | |
| Air Gas | 4,000.00 |
| Cintas - uniforms | 600.00 |
| Clean Fuels (Rins) | 500.00 |
| RINSTAR | 2,500.00 |
| NBB | 200.00 |
| Capital One Corporte Card | 500.00 |
| Garrett Callahan - Water Treatment | 2,500.00 |
| Lower Allen Township | 1,200.00 |
| M3T - Security | 1,100.00 |
| Precision Filtration | 14,000.00 |
| Waste Management | 1,500.00 |
| | |
| **Adequate Protection Payments** | |
| FNB | 21,423.60 |
| Mazuma | 21,203.49 |
| TETRA | 16,157.46 |
| | |
| DelValley ( Boilers) | 12,000.00 |
| | |
| Weekly Payroll | 50,000.00 |
| | |
| **Cash Requirements for Next two weeks** | 241,034.55 |

# EXHIBIT
# C

April 24, 2013

Mr. Robert Chernicoff
Cunningham & Chernicoff, PC
2320 N.2nd St.
Harrisburg, PA 17110

      Re:    Shareholder Loans to Debtor in Possession
              Keystone Biofuels, Inc. and KBI Industries, Inc.

Dear Mr. Chernicoff,

Please accept this correspondence as evidence of the commitment of both Mr. David B. Nagel and Keith A. McMahan, shareholders of KBI Industries, Inc., to provide interim financing to Keystone Biofuels, Inc., as the Debtor in Possession pursuant to a Chapter 11 filing of the U. S. Bankruptcy Code, to assist in resuming operations under the following terms and conditions:

| | |
|---|---|
| Amount of Financing | $ 350,000.00 |
| Interest Rate | 4.0% |
| Terms | Interest only for 60 days |
| | Principal of $5,000, plus interest thereafter |
| Collateral | None |

We understand that the financing set forth above is subordinate to any secured claim of First National Bank.

Please advise if you have any questions.

Sincerely,


_____
David B. Nagel

                     _____
                     Witness


_____
Keith A. McMahan

                     _____
                     Witness

# EXHIBIT
# D

# MEMORANDUM

TO:      Keystone Biofuels, Inc.

FROM:    Tri-Gas and Oil Company, Inc.

DATE:    May 6, 2013

RE:      Purchase and Advance Payment

---

Tri-Gas and Oil Company, Inc. ("Tri-Gas"), or its affiliates, agrees to purchase a total of one hundred thousand (100,000) gallons of biodiesel (B100) from Keystone Biofuels, Inc. ("Keystone"). The finished product purchased will then be sold to AmeriGreen.

Fifty-five thousand (55,000) gallons of finished product will be purchased by Tri-Gas at the rate of $3.95 per gallon for a total of $217,250.00. Forty-five thousand (45,000) gallons will be purchased at the rate of $4.75 per gallon for a total of $213,750.00. The purchase price will be $427,000.00. Keystone will produce fifty thousand (50,000) gallons in its first production run, all of which will be purchased at the aforesaid rate of $3.95 per gallon. A second production run of fifty thousand (50,000) gallons will be done by Keystone with five thousand (5,000) of such run being purchased at the rate of $3.95 per gallon and final forty-five thousand (45,000) at the purchase rate of $4.75 per gallon.

Tri-Gas agrees to buy the feed and chemicals needed to cause the production of the one hundred thousand (100,000) gallons. It will store the feed and chemicals at Keystone. Keystone will produce the one hundred thousand (100,000) gallons of B100 biodiesel.

Tri-Gas will sell the one hundred thousand (100,000) gallons to AmeriGreen for the total sale price of $431,000.00. The feed and chemicals will cost $427,000.00. Tri-Gas will receive a $4,000.00 profit for facilitating the transaction.

AmeriGreen's terms are payment net ten (10) days. Thus, Tri-Gas should receive payment of its advances for materials in approximately fifteen (15) days after shipment.

Keystone will receive $22,000.00 from the recovery of chemicals which is estimated to be at the rate of 22¢ per gallon for a total of $22,000.00 gross profit to Keystone.